May it please the court, this case presents two guidelines issues which together more than doubled Mr. Shell's advisory guidelines range. I'd like to address both, but I'd start with the crime of violence issue. The question there is whether a sex offense that is based on legally invalid consent qualifies as a crime of violence under section 4B1.2. To be clear, the state offense that we're dealing with here, which is second degree rape under North Carolina law, covers a number of scenarios where the victim of the offense says yes to the sexual act, but that yes answer is invalid under state law. So for example, it covers a situation where a person who suffers from intellectual disability or low IQ says yes to a sexual act. It covers a situation where a person suffering from dementia or Alzheimer's says yes to a sexual act. And it covers a situation where a person has been given an intoxicant and then says yes to a sexual act. In all those situations, there is a yes answer which indicates consent as a matter of fact, but it is invalid under state law. So to steal a phrase from the Tenth Circuit's recent decision in the Wray case, this is a statute that does not preclude the possibility of factual consent. The proper framework for analyzing that issue, a statute like that, under section 4B1.2 is set out in detail in this court's decision in Leshen from 2011. Now that's an unpublished decision, so it's not binding on this court, but it is very much on point. It is persuasively reasoned, and this court should follow it just as the Tenth Circuit recently followed it in the Wray decision. I think there are two key takeaways from the Leshen decision that apply here. The first is that when we're analyzing section 4B1.2, we look to the text of the guidelines, which consists of subsection A1, which is often referred to as the Force Clause, and subsection A2, which is known as the Residual Clause. The government gets that analysis backwards by beginning with the commentary to 4B1.2 and giving it an improbably broad dictionary-surfing definition that cannot be squared. In fact, the government barely even attempts to square it with either the Force Clause of A1 or the Residual Clause of A2. The second takeaway from Leshen is that when it comes to sex offenses, the Sentencing Commission has chosen consistently to define section 4B1.2 more narrowly than it defines section 2L1.2. In fact, I would point out something that isn't explicit in the briefs, which is that up until the year 2000, the Sentencing Commission in 2L1.2, in fact, cross-referenced the crime of violence definition in 4B1.2. But in 2001, in Amendment 632, the Sentencing Commission made a choice to create a distinct, different, and broader definition for section 2L1.2 and to apply it only there and not in 4B1.2. As this Court recognized in Leshen, the Sentencing Commission has since that time consistently defined 2L1.2 to cover a broader range of sex offenses than are covered under 4B1.2. And this Court is constrained to respect the Sentencing Commission's decision in doing so. So if we walk through the analysis that Leshen requires us to undertake. With respect to the predicate offense, the North Carolina offense, suppose that there is a small category of crimes where there is consent. Don't cases like Duenas-Alvarez and others ask that we look at the heartland of what the predicate statute is aimed at? That is true. But I would point out, one, the government doesn't even make an argument under Duenas-Alvarez and James, the cases you're referring to. And I think that's for good reason. Duenas-Alvarez and James. I mean, there are two cases the Supreme Court handed down which indicates, you know, you can always find an outlier or you can always find, you know, some conceivable hypothetical that is not going to be necessarily violent. But what you have to look at is a common sense universe of what it's likely to be. Judge Wilkinson, the problem with that argument, and the reason I suspect the government didn't bother making it here, is it's exactly the argument that the Inbank Court rejected last year in the Aparicio-Sorio case, where it said we don't look just at what published cases are out there and whether there's actual violence in those cases. What we look, as the court said in Aparicio-Sorio, is to the elements of the offense and whether they permit prosecution for these cases. And that's very clear here that the elements of these cases do not require a lack of consent. So if you look at the North Carolina pattern jury instructions, subsection 1 under 1427.3 is the by force and against the will of another person provision. The jury instructions there do require a lack of consent to be found by the jury. But if you look at section 2, which is the provision, the main provision we're dealing with here, the jury instructions do not require a finding of lack of consent, and actual consent is not a defense to this charge. So what all the juries are required to find under subsection 2 is, one, that there was a sexual act, two, that there was a mental disability, and three, that the defendant was aware of the mental disability. So factual consent is rendered entirely irrelevant in these cases. And the way that it works in practice is illustrated by the case of State v. Hunt. Aren't you trying to get us to accept essentially this proposition, that the act of engaging in intercourse with someone who is incapacitated, or mentally disabled, or physically helpless, that does require physical force, doesn't it? That person is in no position to consent. It's not really analogous to statutory rape. I mean, we're talking about a particular category of persons who are most vulnerable, most in need of some sort of protection from the law. And someone who, because they don't have volition, and they don't have the ability to consent, and someone who overpowers them, or just totally deceives them, or whatever, I just find it hard to get my mind around the notion that someone who engages in vaginal intercourse with somebody who's incapacitated, or mentally disabled, or physically helpless, doesn't involve physical force, purposeful, aggressive conduct. And to say that that's not a crime of violence, I don't know how that squares with common sense. I mean, the elements of incapacitation, and mental disability, and helplessness, would itself seem to cover that. Several ways I'll respond to that. The first, and I think the broader issue, is these are certainly distasteful crimes, but that doesn't mean they're violent crimes. And I would first start with the point you make about the force clause, and does this require an element of physical force. The government more or less concedes at page 24 of its brief that it doesn't. It describes the statute. The second subpart is covering offenses that are committed through power or pressure without requiring the use of physical force. You've raised your microphone up a little bit. I want to be sure I hear you. I'm sorry. Now, even if the government hadn't conceded, or effectively conceded that point, their argument about the force clause is foreclosed by this Court's decision in Chacon, which analyzed the force clause, concluded that a very similar Maryland statute does not require an element of physical force. I would also go to sort of the... Well, you say it's foreclosed by precedent, and you talk about lessing or whatever it is, but we do have a published opinion out there, don't we, with a Maryland statute, Chacon? Exactly. I know all these arguments about 2L1 and 4B1 being different and everything, but the fact remains that we have a precedent out there, and it says that you can still have compulsion under that Maryland statute, even if there's no element necessarily of physical force. And I don't understand, as long as we're talking about the precedent here, why Chacon doesn't merit some respect. Sure. The government, I agree with you, argues that we should just copy and paste the analysis from Chacon from 2L1.2 over into 4B1.2. I think there are three key reasons why the Court shouldn't do that. The first and the most important is that nothing in Chacon considered the Amendment 722 that the Sentencing Commission passed, which is directly relevant to this issue here, because that case was decided before Amendment 722 became effective. And in Amendment 722, the Sentencing Commission responded to a circuit conflict that had arisen as to whether this exact type of offense qualifies as a crime of violence. And what it said in that amendment is, yes, for purposes of 2L1.2, these types of offenses do qualify as crimes of violence. If we were here under 2L1.2, we wouldn't be here. I would have conceded that this offense does not qualify under 2L1.2. But in that Amendment 722, the Sentencing Commission expressly said this amendment applies to the crime of violence definition in Section 2L1.2. It could have very easily have chosen to extend that amendment to cover Section 4B1.2, and then we'd have a very different case here. The Sentencing Commission made a choice, and this Court is constrained by that choice. The second reason I would say— I'm not sure that that overruled our Chacon case. It didn't overrule the Chacon case, because Chacon is under 2L1.2, which is a very different context. So if we look again to the other differences, the other two reasons I have that Chacon shouldn't apply, the first is that 2L1.2 is a very different analysis than 4B1.2. The Court has been clear in Leshen and in all kinds of other cases— Didn't Chacon still deal with the question of whether a forcible sex offense had to be considered a— It did. What Chacon did was to look at the dictionary definition— —a crime of violence and the fact that Chacon said that the fact that the word forcible was used didn't automatically take it out of a crime of violence. Judge Wilkinson, you're right. What Chacon did do was to look at the dictionary definition of the phrase forcible sex offenses. At that time, there was no modifier on it. The Commission added that modifier to cover these types of cases and applied it only under 2L1.2. But this Court has never applied that kind of dictionary-surfing analysis under 4B1.2. And the reason is that 4B1.2, the text of that guideline, has the force clause and the residual clause. To fall within 4B1.2, you have to satisfy one of those two things. But the wording of 4B1.2 remains what it was. That hasn't been amended. And in light of the fact that the wording has not been amended of 4B1.2, it would seem that Chacon would have some relevance. You also make the argument that the use of forcible sex offenses in the commentary of the guidelines was in some way inconsistent with the use of physical force in the text of the guidelines. And I find that a little bit odd because when you're dealing with a Chevron situation, you have a regulatory agency which is separate from the legislative entity that passes the enabling statute. But here, you have the same commission that's drafting both the text of the guideline and the commentary, so you're not having a separate regulatory agency stepping in. You're saying that the commission, after using physical force, then turned right around and contradicted itself. To clarify exactly what our primary position is on that, is that I don't believe there's an inconsistency between the commentary and the text. And the reason is that I believe if you interpret the commentary the way it should be interpreted, it's very much consistent with the text. The problem arises is that if you accept the government's improbably broad reading of forcible sex offenses, then you run into an inconsistency where all of a sudden, based on their broad definition of that term, it reaches all kinds of offenses that don't fall within the text of A1 and A2. So, yeah, our position is there is no inconsistency, and that inconsistency only arises if you accept this extremely broad dictionary-based definition of forcible sex offenses. And one other point I would make in terms of the connection between 2L1.2 and 4B1.2 is, as the Court pointed out in Chacon itself, 2L1.2 includes the sex offenses that are not forcible, such as statutory rape and sexual abuse of a minor, and those are excluded from 4B1.2, which is another indicator that the meaning is going to be different. But we're always hammering the sentencing guidelines and these statutes in Congress for being too vague and too broad. Here, the Sentencing Commission is trying to be specific. And, Judge Wilkinson, I think you'd be entirely justified in this case to rule in our favor and then write a concurrence that says, Sentencing Commission, you should revise 4B1.2 and you should include forcible sex offenses that are based on involuntary consent. That's absolutely a key part of the judicial role. I would encourage you to do it if you believe it's a policy matter that the Commission should amend the guidelines in that direction. The problem we come down at the end of the day is whether somebody who has sexual intercourse with an incapacitated person or a mentally disabled person or a helpless person, do we come at the end of the day and say, oh, but that's not a forcible sex offense? I mean, it's hard for me to get my mind around that kind of thing. Judge Wilkinson, I think that instinct would have more potency if we were dealing with a situation where incapacitated meant someone who was comatose, for example. That's not what we're dealing with here. This statute reaches all kinds of persons who you interact with in everyday life, people who are suffering from dementia and have problems with employment. You have to know that person. It's not that you blunder into it. You have to know that person is incapacitated. Well, you have to know that they're suffering, for example, from a disability or a low IQ. That doesn't mean you – There's a strong mens rea element to the North Carolina statute. Well, it's interesting that you say that because if you look at the way North Carolina law interprets it, there's no expert testimony, for example, required to establish their incapacity to consent. The state can prove its case under this statute simply by putting on lay testimony that a person is in special ed classes and has a low IQ. And all of a sudden there's a presumption under state law then that that person is incapable of consenting to sexual activity. That's in State v. Hunt, which is 722 Southeastern Reporter 2nd 484. The court rejected a rule that expert testimony was required. All right. I'm going to ask my good panelists if they have some questions. Can I ask a question about the reckless endangerment issue? Absolutely. And because I know you're out of time, I'm going to just cut right to the chase. It looks to me like there's two different narratives about the facts, and you could accept either one. Normally I would say, well, then I'll defer to the district court under clear error. I can't say that what the district court found was clearly erroneous. So what's the problem with that? What's your response to that? Two problems. First is that the district court didn't make a finding on this. Getting past that procedural problem, I think that the inference of awareness the government is trying to draw is undercut by the actual evidence. And there are two pieces of stuff I'd point to very quickly. Can we go back to your first point that the district court didn't make a finding? Right. So if you look at Joint Appendix page 58 and 59, there is no finding that he was – He recites the elements of the – he basically just recites the – He recites the elements and doesn't make a finding that he was aware of the pursuit. And that's what – if you look at Marta Kanan, which we cited on page 10, it says it applies only if the defendant knows he is fleeing from an officer who is in pursuit. There's no finding of knowledge that he's in pursuit at the time. So there's no finding to which I could defer. Right. There's no finding to which you could defer is step one. And step two is we think there is no evidence that would support a finding. We think that, you know, the government – we don't have direct evidence. The government is trying to draw an inference here based on circumstantial evidence. We think the inference of awareness they're trying to draw is undercut by two of the facts. The first fact, undisputed, is that Joint Appendix page 38, the officer says, by the time I made a U-turn and began my pursuit, Mr. Schell was out of sight. So we know he wasn't aware of it through that. And the second piece of evidence they point to is that they say the government says he attempted to turn right, and that's consistent with the officer's experience. The problem with that is it's undercut by the eyewitness testimony of Ms. Smith, who saw the accident and didn't testify, despite what the government kind of suggests, that she saw him attempt to turn right. What she said, if you look at Joint Appendix 44 and 45, is that when I looked up in my rearview mirror, he was already sideways in the road coming at me, and I had to accelerate to get out of the way. It's happenstance that he happened to lose control and slide off to the right as opposed to slide off to the left. And if he would have slid off to the left, apparently the government wouldn't think that its inference is justified here. So that would be our response. Okay. Thank you. Mr. Miller. May it please the Court, William Miller on behalf of the United States. The District Court correctly calculated the defendant's guideline range in this case, and therefore its judgment should be affirmed. Beginning with the crime of violence enhancement, this Court has previously held that a statute, like the one at issue in this appeal, falls within the ordinary meaning of forcible sex offense. The defendant's attempts to distinguish that holding and to argue for a different outcome in this case are unpersuasive for three primary reasons. The Sentencing Commission made the distinction, didn't it? It's not a question of whether Statute A and Statute B should be interpreted the same way. The question is whether Guideline A and Guideline B should be interpreted the same way, and we look to the Sentencing Commission's guidance on that. Isn't that correct? That's correct. At the time this Court decided, chaconned, and held and identified the common ordinary meaning of forcible sex offense, there was no clarifying parenthetical, so it was interpreting that term based on just the plain language of the term. And the analysis that the Chaconne Court followed was to look at dictionary definitions, common meaning and common usage. And based on that analysis, the Court decided that physical force is not required for forcible sex offenses. It's enough to have a degree of compulsion that's accomplished through power or pressure. And so that plain meaning of the term forcible sex offense doesn't change based on where the words appear. You just spoke for 90 seconds and didn't mention the Sentencing Commission at all. So I'm hard pressed to understand how that's responsive to my question, Mr. Miller. Well, the term forcible sex offense, prior to the addition of the parenthetical, is not defined by the Sentencing Commission in either 4B1.2 or 2L1.2. So in the absence of a defined term, that's the analysis that the Chaconne Court followed that I referenced earlier, is you do look at the common ordinary meaning. And so in the absence of a definition for the term, this Court's process is to follow that analysis, to look at the dictionary definitions and the common ordinary meaning. Counsel, I'm sorry, I just want to make sure I understand. I mean, it is sort of defined for purposes of 4B1.2, right? Because we know it has to be an example of the textual definition, right? So I feel like it is defined for 4B1.2 by the textual definition, which we know it has to fall under. In a way, it was never defined under the immigration enhancement. Are those not different contexts? The context does matter, obviously. And in this case, there's no tension between the text of the guidelines and the commentary of the guidelines. I think it's beyond dispute that a crime that involves sex accomplished by compulsion, power, or pressure, and involves sexual intercourse with someone who is mentally incapacitated, physically helpless, or mentally defective, that that doesn't present a risk of physical harm or is not purposeful, violent, and aggressive. And so the plain ordinary meaning from Chaconne, its definition of forcible sex offense, is harmonious. So which clause do you think it falls in under the text of 4B1.2, putting to one side the commentary? Which clause are we under? For part two of the North Carolina statute, that does not require an element of force. And so it would not qualify under the force clause. So we're under the residual. It would be under the residual clause, which is really sort of the second portion of part A.2 there. And in this situation, the term forcible sex offense can be interpreted according to its plain meaning, as this court has already determined it, and still harmonized with A.2. There's no tension there because it does present a risk of physical harm and is purposeful, violent, and aggressive. And in Thornton, we said, how is Thornton different? And that's where I was headed. Leshen and Thornton and Ray, the case that the defendant cited in his 28-J letter, those are all distinguishable because they are statutory rape cases. And the statutory rape cases, all of them are very careful to distinguish statutory rape cases where the consent is invalid as a function of age with forcible sex offenses like the ones we have here. So what's the difference between invalid consent as a function of age and invalid consent as a function of intellectual impairment? What's the difference? That's the distinction that was discussed in Ron Hill Castaneda as well. So what's the difference for our purposes under 4B? The difference is that the statutory rape context does not necessarily require that forcible component that's present in this statute. But I thought you agreed with Judge Harris that we're no longer under Subsection 1. We're in the residual area, right? Forcible. Forcible and forced are not synonymous. So what Ron Hill Castaneda said is that statutory rape- Well, what's forcible about an invalid consent of an intellectually impaired victim under this statute? It's forcible. And it's one of these where you don't have to take my word for it. That's forcible because it involves power or compulsion, which is not necessarily a component- But we weren't looking at 4B in Chaconne. You're looking at the term forcible sex offense, though, and it determined a plain, ordinary meaning. And so the question is, should that plain, ordinary meaning also apply in the 4B1.2 situation? And the next question then is, is there something about the context that suggests we should apply something other than the plain, ordinary meaning as this court has found it? And the government's position, and what I'm arguing here, is no, there is not. And the statutory rape analogy that the defendant seeks to draw is distinguishable. So those cases- Why is it distinguishable? Just as a matter of common sense. Tell me what's different. As a matter of common sense, you can have an age-based crime where you have perhaps one teenager who's above the age of consent and another who's not. We wouldn't necessarily consider that forcible. And that's the distinction that the court drew in Ron Hill-Castaneda when it- But you wouldn't consider it forcible because it doesn't involve force. It involves, like, the person says yes, but they didn't have the legal ability to say yes. How is that different if it's- say it's two teenagers. It's like a 19-year-old and a 17-year-old, and the 17-year-old doesn't- has some mental impairment. But there's no force. It's distinguishable in that it doesn't require the degree of compulsion that this court has found attaches to forcible sex. If there's no compulsion, why is it statutory rape? Why is it criminalized? I assume we criminalize statutory rape because we do think there's compulsion of the same sort. You were talking about here. She's only 15. She can't say yes. I just don't see the difference between a 15-year-old and someone with a mental impairment. And I would call the court's attention to the Leshen decision in particular because in my version, it's page 5, but I just have the Westlaw version here. The court goes through and distinguishes forcible sex offenses, as the term is also used in Chacon, and says that the Kentucky statute and the Pennsylvania statute at issue are not those types of forcible sex offenses. They're age-based crimes. And the Kentucky and Pennsylvania definition of forcible were, as the Leshen court recognized, broad definitions that included compulsion by intellectual, moral, emotional, or psychological force. And so the court was very careful in Leshen and in Thornton to distinguish those types of crimes, which is the type of crime we have here. Well, I was on the Leshen panel, and I'm still having difficulty understanding the distinction you're trying to draw between a 14-year-old, chronological 14-year-old, and a 42-year-old who has the mental age of a 14-year-old. Each gives consent. There's no difference whatsoever in the use of force by the perpetrator in both cases, and so I'm having difficulty understanding the distinction you're seeking to draw between those two instances. Can you help me? I mean, and it's the distinction that was drawn in Ron Hill-Costaneda as well,  Well, but I'm asking you to tell me now, today, on this record, under this statute, under 4B, what is the distinction? The distinction is that you can have an age-based crime that doesn't require the same degree of compulsion, power, or pressure as a crime where someone's incapacitated, helpless, or mentally defective. But it's exactly the same. There's consent by a 14-year-old, one chronologically 14, and one intellectually 14, but there's actual, factual consent in each instance. No threat, no threat of force, no use of a weapon, no coercion beyond the elicitation of the consent. And I think the distinction comes in, in the marginal case under the statutory rape context, where you do have two consenting individuals, where one of them, just based on a function of age, is below the threshold for the statute. And so, that situation, and I won't say it again, but as this Court has recognized, does not necessarily require that same degree of compulsion as forcible sex offense as defined in the statute. It isn't the response that this statute is a more carefully cabined category of people. When you're talking about statutory rape, you're talking about an entire nation of 17-year-olds. And, no, I myself have never been able to buy the argument that statutory rape was a crime of violence. But, where you're talking about carefully cabined categories of physical helplessness or mental impairment, and somebody has to know that, and when you're physically, when you're mentally incapacitated or disabled, that almost, by definition, precludes anything that we would ever regard as meaningful consent. The statutory rape business is much more open-ended. It includes an entire universe of 17-year-olds in some states who may have the maturity level of somebody 21 or whatever. The universe is just too large and it sweeps in all kinds of juvenile, non-violent behavior. But here, you're requiring that somebody knows that someone is mentally disabled and yet goes and performs sexual intercourse on that person, takes advantage of that individual's vulnerability, evident vulnerability, in a way that a 19-year-old would not necessarily do with someone 17. Yes, there are situations where a 42-year-old could take advantage of a 17-year-old or whatever. Maybe there are heinous situations, but there are also all kinds of innocuous situations. In this, that's much less likely to occur, and I think that's the distinction. But beyond that, is footnote 1 on 4B1.2, did you say you thought that was a commentary section to A1 or A2? I don't know that it's that specific. My response to Judge Harris' question was whether or not Part 2 of the North Carolina statute. Okay, because I read the commentary in A1 as a clarification of the force clause. I didn't think it would be, that opening sentence would be a clarification of the residual clause because the capital A and everything seems to cover the residual clause in that footnote. But, I mean, it's easy, I think, to lose the forest for the trees here and to get so, you know, I think Chaconne could well cover it, other people may not. But the point is, this is one of those cases, I guess your argument is, that this is one of those cases where it's impossible to step back and say, what are we being asked to do? And we're being asked to say that a predatory act against defined categories of the most vulnerable people in our population is not a forcible offense. Chaconne says it can involve all kinds of compulsion, but how can it be that people who cannot in any volitional sense defend or speak for themselves and they're taken advantage of in this way by someone who knows, who knows of their vulnerability and their disability and we're being asked to say that's not a forcible sex offense. That's the forest here. There are lots of trees, we can go back and forth on the trees, we have all argument long, but that's what's at stake. To your earlier question, Judge Harris, what Judge Wilkinson has articulated is why I think that the Chaconne formulation of forcible sex offense is harmonious with the crime of violence definition. And I will totally stay in the forest. So tell me then about this North Carolina statute and how I can be sure that the North Carolina statute wouldn't also cover the equivalent of the two teenagers, what we are now thinking of as innocuous violations of the statutory rape law. There are no close cases under the North Carolina law. There's no people who maybe have some mental disability, they're in special ed class, but actually they're still allowed to have sex and they can consent and we never get that mixed up in North Carolina. Two responses to your question. First, for purposes of the residual clause analysis, the focus is on the risks presented by the ordinary case. And so the marginal cases don't factor in. But I don't understand then how that distinguishes. So you're telling me that the Hartley and statutory rape case is something that everyone can agree shouldn't be criminalized because it's just a 17-year-old girl who's perfectly capable of giving consent. That hasn't been the judgment of this court in Leshen and Thornton. But at the risk of going back to that, the court in both of those cases and in Ron Hill Castaneda was careful to draw a line between those sort of forcible offenses that were discussed in Chaconne and statutory rape offenses and found that the statutory rape offenses did not, in the ordinary case, present this set of risks. I'd also point out that in the illegal... This just strikes me. Sorry, I will let you go in one second. So there's court rulings saying the ordinary statutory rape case actually really shouldn't be criminalized. This law mostly criminalizes conduct that does not present a risk of physical force or any other kind of risk that we should care about. Doesn't that strike you as sort of counterintuitive? It does, and I actually argued that it should qualify previously in Ron Hill Castaneda in law. But to the second response to your question about what's criminalized by this North Carolina statute, I would draw the court's attention to the Etheridge decision, which is a Supreme Court case that's cited in the briefs. And in that case, the definition of constructive force that the North Carolina Supreme Court uses is on all fours with the Chaconne definition. It says that constructive force may be established by actual physical force or by constructive force in the form of fear, right, or coercion. And so it's using the same language that's consistent with the common ordinary meaning of forcible sex offense as interpreted by Chaconne. It actually goes on to say constructive force is demonstrated by proof of threats or other actions by the defendant which compel the victim's submission to sexual acts. And so there's the North Carolina Supreme Court interpreting its own statute in a way that brings it within the Chaconne definition of forcible sex offense. Mr. Miller, are you aware that the Supreme Court has the constitutionality of the residual clause under ACCA set for argument next month? Does that bear at all in your view on this case, either on the decision of the legal issues or whether this court should hold this case in abeyance after argument or any other thing you want to comment on? And we'll hear from your colleague there as well. For my own professional development, I don't want to wade too far into the government's position in that Supreme Court case, but I will say that should the residual clause be found to be unconstitutionally vague, it obviously could have implications on the guidelines that will have to be fleshed out at that time. I think in this case, because our crime satisfies one of the enumerated offenses in the commentary, that should the residual clause be found to be unconstitutional, there still would be an argument that should the court affirm that that would be unaffected by any further decision on the... Do you think the decision is likely to impact the force clause? I hesitate to really speak too much on that at all, but I think... That's not before them. Correct. My understanding is that the issue is squarely whether or not the residual... It's a vagueness question with respect to the residual clause, and I was looking at footnote one. This is the attempt of the sentencing commission to be as unvague as possible, so maybe they're going to hit them going and coming, but I thought this was a more specific... It seemed to me to be a world away from the language that a serious potential risk of whatever... Right, so that's why I was sort of saying that should the court affirm, I think the fact that that's an enumerated offense in the commentary may mean that any decision by the Supreme Court would not affect this. Unless the court has any further questions about... My colleague has another question. I'm sorry, I just want to go back to the reckless endangerment thing for a minute. I guess I'll sort of ask you the same question, but now I'll frame it slightly differently. So it looks to me like the facts in this case are actually quite close on whether the defendant knew that he was being followed by the police at the relevant time, and I am troubled that it is hard to find sort of... And normally I would just defer to the district court. Great, that's not my problem. But I am troubled by the idea that it's actually... It's not clear that the district court actually made a finding on this, and I'm troubled about that. I think that is true, both because just looking at the text, it's not clear, and also there was no clear Fourth Circuit law requiring that he make that finding. So normally I would also just infer, well, he had to make the finding. I expect he did. But he didn't have to make the finding. There was no clear law requiring it. There's nothing that jumps off the page as a factual finding. So would it be wrong to sort of send it back and let the district court make a finding? I think it would be unnecessary in this case because the parties presented all the same arguments below. You have to consider the court's ruling in context. I did, but you know, like the couple of paragraphs before he finally gets to it, he's talking about something entirely different, whether there really was a risk of harm to this woman. He doesn't talk at all about, I am looking at it in context, and that's what troubles me. Right, and when he actually recited sort of his holding, it did include that language of... It did, but he's just reading the enhancement. I'm sorry, I don't mean to be argumentative. But it does include language of while fleeing from law enforcement. And so given the party's arguments and his finding that this is reckless endangerment during the course of fleeing from law enforcement, there would be no need to remand for him to just confirm once again that this is during the course of fleeing from law enforcement. But even though that's the sort of legal question, whether while fleeing from law enforcement means you have to know the police are following you. Are you conceding that that is the right reading of the enhancement? I believe it is. I mean, there's no real dispute among the circuits. This court hasn't weighed in on the issue. But we haven't weighed in on it, right? So for purposes of this district court judge, there is no requirement that he... necessarily know that... Right. And I would just also briefly say that on these facts, there's really no... There's no question that the inference that this was during the course of fleeing from law enforcement is not supported by these facts. So you think that the evidence before the district court went to the fact of knowledge of the policeman's presence? I mean, the odd thing about it is that they're traveling in different directions. And that's what's sort of unusual because normally you've got a policeman coming up behind you in the same lane or at least going in the same direction. And so I guess your response to that is it's a preponderance of the evidence standard. And you can take into account circumstantial evidence and the discussion about the 911 number and the turning in to the side thing and speeding up and all of those things are circumstantial factors that would support the finding. The question is... And I'd also say that... The other critical fact there is that the defendant admits that he did see the patrol officer. They passed within 20 feet. And this is not the 7 to 9 miles over that we all did on the way to Richmond this week. This is 25 miles over the speed limit. And so the fact that he continues at that rate of speed easily supports the court's inference that he's now fleeing from law enforcement. He's committed a crime in the presence of law enforcement. That he saw. And he's continuing to speed to get away from that. That's easily supported with that key fact that he did, in fact, see them as they passed within 20 feet. Very quickly, if I may, just so I'm clear. Even inside the question of whether... Of course, whether Chaconne was correctly decided or whether it would be decided the same way today. Your position is that the sentencing commission's amendment to 2L is irrelevant to this court and we are free to infer anything about the difference between 2L, the reentry guideline, and 4B, the career offender guideline. Because before the sentencing commission clarified the 2L guideline, we had rendered a decision on the meaning of forcible sex offense, and that's the end of it. Did I correctly state your position? I believe so. The government's position is that the plain meaning of that term has already been defined. And so the question then becomes, is there something about the context that suggests that this court should apply a different plain meaning, or rather not apply a different plain meaning? Well, let me suggest an answer to that. That's a fair observation. At the time of Chaconne, there was a circuit split. This court took the minority view and imported a notion of force in the meaning of forcible sex offense under statute that clearly, clearly didn't involve force, involved invalid consent. The sentencing commission then comes along and says, okay, there's confusion out there. We got a majority rule. We got a minority rule under 2L. Here is what we really mean under 2L. Okay? So it turns out that this court got it right under 2L. It turns out that we got it right under 2L. Now, two years later, this issue is presented under 4B. The government's argument, as I understand it, is that even if we hadn't decided Chaconne the way we had, I think the government would be arguing today that we should import this notion of force into the meaning of forcible sex offense in a statute that clearly doesn't require force and that clearly the sentencing commission hasn't told us it requires force or invalid consent. And the use of the word force, I mean, it's forcible in this situation. And so the plain meaning, as this court found, of forcible is that that can include a degree of compulsion that doesn't rise to the level of physical force. And so perhaps we would be making the same argument under 4B.1.2 that the government did in Chaconne, but the fact of the matter is the court's already established what that forcible plainly means. And so we don't have to relitigate that issue. That's already been said. Part of your argument would have to be that the terms themselves were not changed. The terms themselves in 4B and in the commentary of footnote 1 are the same terms that were at issue in Chaconne. Now, there can be amendments, but the argument on the amendments are some repeal by implication of those terms. The terms themselves, if there were an amendment that somehow changed the terms of 4B.1 or whatever, that would be enough to set aside our precedent. But we don't set aside our precedent based on implications. And that's where the terms remain the same and have a precedent that interprets that text, that language in a certain way. It's hard to run roughshod over repeals by implications. I mean, this is a principle that cuts different ways. Maybe times when I'm asked to overrule or turn my back on a precedent because there's been an intervening development by implication. And, you know, I just think candidly the precedent is worth more than that as a neutral principle. Right, and so that's the government's position is the plain meaning's been set, nothing about that amendment overruled that precedent or that... I don't think the government's ever disagreed with Judge Wilkinson's approach to the guidelines. Sometimes I think... He gets credit for that. That's not fair. He ruled against me in Ron Hill-Castaneda, so he disagreed on that. I gave you a horrible time in the previous case that you were up here on. Mr. Carpenter, I spoke about that earlier. The 17-year-old rape victim. Mr. Carpenter was about to hug me. So unless the court has any further questions, I just ask that you affirm the judgment of the district. I'm hoping to convince you to go my way so I can get another hug. I want to respond very quickly to a few of the points that the judge has raised, and then get back to the argument more generally if there are questions. First, Judge Harris, you asked about state law, and Mr. Miller cited State v. Etheridge. I want to make very clear, if you look at page 680 of that opinion, that is interpreting subsection 1 of 1427-3, the force clause. It does not interpret subsection 2, so it's not relevant to what we're dealing with here. Judge Davis, your question about Johnson. My view is you should agree with us that this doesn't fall within the residual clause without worrying about Johnson. If the court is tempted to go with the government's argument that this somehow slides into the residual clause, I would ask the court to wait until Johnson is decided so we can see in brief if it impacts the case here. Third quick point about the reckless endangerment enhancement, Judge Harris. I do think it makes sense to announce that the Fourth Circuit agrees with every other circuit that this enhancement requires an awareness of pursuit. I hope you're going to send it back on the crime of violence issue anyway, give the court a chance to make its factual findings with a full understanding of what the Fourth Circuit's requirement is. And Judge Wilkinson, I want to go back to a point that you made that I think is very important and very interesting. You said that you've never bought into the notion that statutory rape should be characterized as a crime of violence. I 100% agree with you as a policy matter, but the Sentencing Commission disagrees, and it included statutory rape as a crime of violence under Section 2L1.2. It's a policy decision that I think is a bad one, and I encourage you to write that concurrence, in this case or another one, saying again, this is a bad decision by the Sentencing Commission and revisit it. But until they take you up on that, we're constrained to treat statutory rape as a crime of violence under 2L1.2, and until the Sentencing Commission decides to extend Amendment 722 to Section 4B, we are constrained to apply the guidelines as the Commission has saw fit to write them. And then I would go back to Judge Harris, to your question about the Thornton analysis, and I think the government had difficulty articulating a distinction there, because there really is none. When you're dealing with cases involving factual consent, when you get to the residual clause, you're doing a risk analysis. What is the risk of physical injury? Where the case involves factual consent, as the government argued in Thornton, your risks of physical injury aren't immediate risks. You don't have to hold someone down. You don't have to beat them or kick them or anything like that. They are agreeing to the Sex Act. The risk of physical injury that was present in a statutory rape case and that is present in a factually consensual relationship under this statute are the risks of an unwanted pregnancy, the risk of a sexually transmitted disease. The Court thoroughly analyzed those issues in Thornton, and I believe it was Judge Duncan's opinion, concluded that they do not present a comparable risk to those of the other enumerated offenses. That analysis is fully on point here and is binding on the Court here. If there are no further questions, I would thank the Court for its time. What do you say, if I understand the government's argument, not in so many words, but essentially the government says, this Court got it right under 2L, and the sentencing commission came along and said, hey, Fourth Circuit, you got it right. And so the government sort of implicitly and plausibly argues there was no need to do anything with 4B, and that therefore sort of the negative inference you're asking this panel to draw from commission silence as to 4B really doesn't help you. That's one version of the government's argument, I think. I think the broader problem with that argument is that at the time that Tracon was decided, as Judge Davis, as you referred to, there was a circuit conflict as to what this term means. The commission stepped in to resolve that conflict, and it chose one definition under 2L1.2, and it left the other definition. Again, the majority rule, as you said at the time, was that forcible sex offenses by itself, unmodified, does not include these offenses that require power, compulsion, pressure. So if the commission said, we're going to take that minority approach and include it under 2L1.2, I think the implication is the majority approach continues to apply under 4B1.2. I guess I'd take a step back. I don't think the commission... I don't think it's a majority-minority approach thing. I don't really think that's the right way to analyze it. I think the right way to analyze it is when the commission passed Amendment 722, it said this applies to Section 2L1.2. What the commission says is what we have to go by. Unlike Congress, the commission can fix these things pretty easily. It amends the guidelines every single year and makes tweaks, makes minor changes. It often does so in response to opinions and concurrences in the circuit courts that highlight problems with the guidelines and with their interpretation. So if the court believes... Why do the terms carry through? The terms, they... It's interesting because they just didn't need... Hmm. They weren't making a change to 4B1.2, I suppose, is one way to say it. There's no opinion out there that had interpreted 4B1.2 the way that this court interpreted 2L1.2 in Chacon. There was no need to make a change there. And there's none today. And there's none today, exactly. And again, the analysis under 4B1.2 is fundamentally different because it begins with the text. As the court recognized in Leshen, 2L1.2 is different. It's defined entirely in the commentary. Back in 2001, the commission made a decision to adopt a wholly different definition. That is, it narrowed in some senses and much, much broader in other senses, and much broader as applied here. Well, I mean, you can argue about the differences, but you do have two elements that are the same. One, the Maryland statute and the North Carolina statute are virtually identical. And number two, the terms in the sentencing guidelines are the same. You've got the physical and the forcible and the question of whether forcible in the context of this particular class of persons requires physical force. So my question is simply one of a question of respect for precedent, where you have statutes as similar as the Maryland statute and the North Carolina statute and guidelines provisions that are using the same terminology, where we just overrule, essentially, a circuit precedent. That's a neutral principle. We all live by that. Well, Judge Wilkins, I don't think there's any need to overrule Chaconne, because its rule is still absolutely correct under 2L1.2. I think that the difference is that the terms, even though forcible sex offenses appears in both provisions, it's used in a different context. And I would point the court to the Castleman and the Johnson decisions from the Supreme Court that were mentioned in the briefs. The Supreme Court has recognized that the exact same statutory phrase can mean different things in different contexts. Those two cases involve firearm provisions where the force clause was used. I know, but you know that there are 100 counter-maxims to that point you just made. Well, exactly. And that's why you have to go through the analysis in every particular case and not just cut and paste the Chaconne analysis, as the government seeks to do under 4B1.2. You know, saying, well, different terms can mean different things in different contexts. I know that. I mean, but then the dissent or the majority of the opposing people on the Supreme Court say we're supposed to interpret terms within the same body of work in the same fashion. So, you know, there's a counter-maxim. I agree. There's always a counter-maxim in statutory construction. I think when you look, though, at all of the canons here, all of the other contextual points here, our argument is much stronger than the government's. Are there no other questions? Thank you for your time. All right, thank you.
judges: J. Harvie Wilkinson III, Pamela A. Harris, Andre M. Davis